2011 VT 14




State v. Rooney (2008-470)


 


2011 VT 14


 


[Filed 04-Feb-2011]


 


NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions, Vermont Supreme Court, 109 State Street, Montpelier, Vermont05609-0801 of any errors in order
that corrections may be made before this opinion goes to press.


 


 



 
 2011 VT 14

 

  



 
 No. 2008-470

 

  



 
 State of Vermont

 

 
 
 Supreme Court

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 On Appeal from

 

 
 
      v.

 

 
 
 District Court of Vermont,

 

 
 
  

 

 
 
 Unit No. 2, Chittenden Circuit

 

 
 
  

 

 
 
  

 

 
 
 Brian Rooney

 

 
 
 March Term, 2010

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 Michael
 S. Kupersmith, J.

 

 
 
  

 
 Thomas Donovan, Jr., ChittendenCountyState’s
 Attorney, Pamela Hall Johnson, 

 
   DeputyState’s Attorney, Burlington, and David Tartter, Assistant
 Attorney General,

 
   Montpelier, for Plaintiff-Appellee.

 
  

 
 Matthew F. Valerio, Defender
 General, Anna Saxman, Deputy Defender General, and 

 
   Jeffrey Rubin, Law Clerk
 (On the Brief), Montpelier,
 for Defendant-Appellant.

 
  

 

  


PRESENT:  Reiber, C.J., Dooley, Johnson, Skoglund and
Burgess, JJ.


 


 


¶ 1.            
BURGESS, J.   Defendant Brian Rooney appeals from his
conviction and life sentence for aggravated murder following a jury
trial.  He argues that: (1) the State’s failure to disclose the Vermont
Forensic Laboratory’s internal validation studies violated his due process
rights and deprived him of a fair trial; and (2) the trial court erred in
denying his motion to dismiss the aggravated murder charge, or, alternatively,
in failing to sentence him under the first degree murder statute in violation
of his equal protection rights under the United States and Vermont
constitutions.  We reject these arguments and affirm both defendant’s
underlying conviction and his sentence.


¶ 2.            
On October 13, 2006, police discovered the body of Michelle
Gardner-Quinn, a University of Vermont student who had been missing since the
early morning hours of October 7.  Gardner-Quinn’s body was found in a
crevasse in Huntington Gorge, and detectives determined the cause of death to
be a combination of blunt force trauma to the head and neck compression. 
The position of Gardner-Quinn’s clothes as well as subsequent medical
examination and forensic testing of her body and underwear indicated a sexual
assault.   


¶ 3.            
Evidence was presented at trial as to the events leading up to
Gardner-Quinn’s disappearance.  On the evening of October 6, Gardner-Quinn
and two friends went out to dinner and to several bars in downtown
Burlington.  At approximately 1:30 a.m., Gardner-Quinn made plans to meet
up with another friend at the Ski Rack, a store located on Main Street, and she
set out alone towards that location.  Gardner-Quinn was unable to connect
with the friend once she reached the Ski Rack.  At this point,
Gardner-Quinn’s cell phone battery died, and she borrowed the phone of defendant,
a stranger who had apparently just left a bar in the area.  Gardner-Quinn
made several calls from defendant’s phone, but was unable to reach the friend
whom she was supposed to meet.  A surveillance video from a downtown store
showed defendant and Gardner-Quinn walking down the street at approximately
2:15 am.  This was the last time Gardner-Quinn was seen alive. 
Defendant was arrested on October 23 and charged with aggravated murder under
13 V.S.A. § 2311(a)(8) for “murder[ing] another human being while
perpetrating a sexual assault.”


¶ 4.            
Defendant was questioned multiple times about what happened to
Gardner-Quinn during the early morning hours of October 7, both immediately
following Gardner-Quinn’s disappearance and several times subsequent to
discovery of her body.  Each time, he denied having any knowledge of what
happened after he let her borrow his cell phone.  Questioning of
defendant’s friends and family, however, indicated that defendant lived
approximately five miles from Huntington Gorge, where Gardner-Quinn’s body was
discovered, and that he was familiar with the area.


¶ 5.            
At trial, the State presented forensic evidence linking DNA found in
sperm taken from a rectal swab of Gardner-Quinn to a DNA sample obtained from
defendant.  Testimony was also presented from the medical examiner,
indicating that Gardner-Quinn was sexually assaulted just prior to her murder.
 The State also relied heavily on testimony from employees of the Vermont
Forensic Laboratory, detailing the processes they used to obtain a DNA sample
from sperm found on Gardner-Quinn’s body and to test whether that sample
matched defendant’s DNA profile.  Marcia LaFountain, a forensic scientist
at the lab who worked on Gardner-Quinn’s case, testified that the result of the
DNA profiling indicated that the probability of randomly selecting an unrelated
individual in the general population exhibiting the combination of DNA types
found from the semen in the rectal swab and the DNA sample taken from Rooney was
approximately one in 240 quadrillion.


¶ 6.            
A substantial portion of the trial concerned whether the sample of DNA
obtained from the rectal swab—which amounted to .24 nanograms of DNA—was large
enough to yield an accurate profile.  The State presented evidence, in the
form of expert testimony from lab technicians with significant experience in
both forensic analysis and quality assurance methods associated with DNA
testing, indicating that the procedures followed by the lab were consistent
with both national practices and with the lab’s own internal procedures. 
Defendant challenged the lab’s techniques, and presented evidence that a larger
sample size of DNA provides optimal results.  Defendant also showed
evidence of irregularities and mistakes in the lab’s handling of other pieces
of evidence in both this and other cases.


¶ 7.            
At the conclusion of the State’s case, defendant moved for acquittal,
arguing that the State had not met its burden to produce evidence upon which a
jury could conclude beyond a reasonable doubt that he sexually assaulted and
murdered Gardner-Quinn.  The court denied the motion.


¶ 8.            
Prior to the close of evidence, defendant moved to dismiss the
aggravated murder charge, 13 V.S.A § 2311(a)(8).  He argued that
because the elements for this charge are identical to the elements for first
degree murder under 13 V.S.A. § 2301, equal protection guarantees of the
United States and Vermont Constitutions entitled him to be sentenced under the
charge with the lesser penalty.  Thus, defendant argued, he was entitled
to sentencing under 13 V.S.A. § 2301, which carries a punishment of
thirty-five years to life, 13 V.S.A. § 2303(a)(1)(A) rather than the mandatory
life sentence attached to § 2311(a)(8).  The trial court denied the
motion in May 2008.  The trial court explicitly rejected defendant’s equal
protection arguments, concluding instead that although “both statutes provide
different penalties for identical conduct, this is exactly the situation that
the [United States Supreme Court] considered when it unanimously held that
overlapping criminal statutes with different penalties do not violate
constitutional principles unless the prosecutor selectively bases the charging
decision upon impermissible considerations.”


¶ 9.            
Following trial, a jury convicted defendant of aggravated murder. 
In July 2008, defendant moved for a new trial, arguing: (1) the trial court
erred in failing to submit lesser included offenses to the jury; and (2) the
State failed to produce “critical exculpatory information” pursuant to Vermont
Rule of Criminal Procedure 16(b)(2).  With regard to the first claim,
defendant argued that the court erred in denying his request that the lesser
included offenses of second degree murder and sexual assault be included in the
jury instructions.  The trial court rejected this argument, concluding
that “there was no evidence that Defendant murdered Michelle Gardner-Quinn
apart from the evidence that he had sexually assaulted her[;] [t]herefore, no
rational jury could find that Defendant committed the murder unless it also
concluded that he had committed the sexual assault.”


¶ 10.        
On the second claim, defendant argued that because the DNA sample
linking him to the sexual assault of Gardner-Quinn was the critical piece of
the State’s case, the State had a duty to disclose validation studies setting
forth the procedure the lab is supposed to use to generate reliable DNA
profiling results.  Defendant claimed these validation studies, obtained after
trial, showed that the State’s expert provided false assertions about the lab’s
ability to generate reliable DNA profiles with .24 ng of DNA input.  The
State denied that the studies were exculpatory, but the court rejected the
claim on other grounds, holding instead that under the standard articulated in Brady
v. Maryland, 373 U.S. 83 (1963), defendant had adequate knowledge of the
existence of these studies and could have requested them prior to trial.


¶ 11.        
Defendant raises two claims on appeal: (1) the State violated its
constitutional obligations under Brady by failing to disclose
exculpatory evidence in the form of validation studies that would have
impeached the reliability of the State’s DNA evidence; and (2) he is entitled
to a new trial, or alternatively new sentencing, because his conduct is
punishable under two statutes with identical elements and differing sentences,
and such a statutory scheme violates equal protection guarantees under the
United States and Vermont Constitutions.


I.


¶ 12.        
Defendant claims that he was denied a fair trial and due process of law
as the result of the State’s failure to disclose the Vermont Forensic
Laboratory’s (VLF) internal validation studies, which defendant obtained
through a motion for post-trial discovery.  He contends that the studies
showed that the .24 ng of DNA input lab technicians were able to obtain from
semen found in a rectal swab of Gardner-Quinn was well below the range that
yielded accurate results in the lab’s validation studies.[1]  He argues that the studies would
have served to impeach the State’s DNA evidence linking defendant to the crime
and, thus, disclosure was required under Brady.  See also V.R.Cr.P.
16(b)(2) (requiring prosecutor to “[d]isclose to defendant’s attorney any
material or information within his possession or control which tends to negate
the guilt of the defendant as to the offense charged or would tend to reduce
his punishment therefor”); State v. Gibbons, 146 Vt. 342, 344, 503 A.2d
540, 541 (1985) (“Impeachment evidence, as well as exculpatory evidence, is
under the protective umbrella of Brady.”).  Because we agree with
the trial court that the existence of these studies was previously disclosed in
discovery and defendant failed to request them, defendant cannot meet an
essential element of the Brady test—that the State suppressed evidence.


¶ 13.        
In Brady, the United States Supreme Court announced that “the suppression
by the prosecution of evidence favorable to an accused upon request violates
due process where the evidence is material either to guilt or to punishment,
irrespective of the good faith or bad faith of the prosecution.”  373 U.S.
at 87.  The purpose of this rule is “to assure that the defendant will not
be denied access to exculpatory evidence only known to the Government.”  United
States v. LeRoy, 687 F.2d 610, 619 (2d Cir. 1982).  There are three
elements of a Brady violation: “(1) the State must have suppressed
evidence; (2) that evidence must have been favorable to the defendant because
it [was] either exculpatory or impeaching; and (3) the defendant was prejudiced
as a result.”  State v. LeClaire, 2003 VT 4, ¶ 8, 175 Vt. 52, 819
A.2d 719 (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).


¶ 14.        
A defendant who is aware of essential facts that would allow him to
request the exculpatory evidence at issue, yet fails to act on that knowledge,
cannot fault the State for failing to produce it.  In State v. Tester,
for instance, we concluded that no Brady violation had occurred, despite
the State’s failure to disclose a videotaped interview of the victim, when the
defendant was “well aware” of the existence and contents of the interview.
 2007 VT 40, ¶ 17, 181 Vt. 506, 923 A.2d 622.  Because the
defendant “clearly could have discovered the videotape through the exercise of
due diligence,” we concluded, there was no “suppression” of the allegedly
exculpatory videotape.  Id.  Similarly, in LeClaire, we
concluded that the defendant had not shown that the State improperly suppressed
evidence where the prosecution failed to produce a sample of the victim’s hair
for DNA testing despite the defendant’s request to do so because the defendant
had not taken steps to request the necessary exhumation order.  2003 VT 4,
¶¶ 9-10; see also LeRoy, 687 F.2d at 618 (“Evidence is not ‘suppressed’
if the defendant either knew, or should have known, of the essential facts
permitting him to take advantage of any exculpatory evidence.” (citations
omitted)).  The State cannot be found to have suppressed evidence if the
same information was available to the defendant through the use of “reasonable
diligence.”  United States v. Morris, 80 F.3d 1151, 1170 (7th Cir.
1996), cert. denied, 519 U.S. 868 (1996).[2]  


¶ 15.        
Defendant’s theory of the case centered on the adequacy of the DNA
profiling procedures that the lab used to identify defendant as Gardner-Quinn’s
assailant.  The basis of defendant’s challenge was that the sample size of
the DNA taken from sperm found in Gardner-Quinn’s body was too small to yield
an accurate profile.  Indeed, the size of the sample was a contested point
during the trial, and the jury heard much testimony from lab technicians
concerning proper testing methods and validation studies.[3]  The State relied on Marcia
LaFountain, a forensic scientist at the lab specializing in DNA analysis. 
She testified as to the methods of testing used in this case; the steps taken
to secure an accurate result; the amount of DNA sample obtained from sperm
found in a rectal swab of Gardner-Quinn (.24 ngs); and the result of the test,
which indicated that the probability of randomly selecting an unrelated
individual in the general population exhibiting the combination of DNA types
found from the semen in the rectal swab and defendant’s DNA sample was
approximately one in 240 quadrillion.  On cross-examination, defendant’s
attorney explicitly asked LaFountain whether the kits and technology used by
the lab had been subject to validation studies, and she answered that they had.
 Defendant’s attorney then questioned LaFountain about what exactly
these types of validation studies entail.  Next, defendant’s attorney
questioned LaFountain about a manual accompanying the DNA profiler kit used by
the lab.  The manual included reference to internal validation studies and
was subsequently admitted into evidence.


¶ 16.        
The State also relied on testimony from Eric Buel, who has been the
Director of the VFL since 1998.  The State asked Buel about the kit
manual, which recommended a range of DNA input sample from 1.0 to 2.5 ng, a
range obviously above the .24 ng sample used in this case.  Buel testified
that though the manual did indeed recommend that range, “the kit components
have been used successfully to type samples containing less than one nanogram.”
 Defendant, therefore, had ample knowledge of the existence of the
study.  Indeed, during closing remarks, defendant’s attorney tried to use
the State’s failure to introduce these validation studies into evidence to his
advantage:


[The prosecution]
asked Doctor Buel . . . [d]oes the Vermont Forensic
Laboratory have validation studies that allow it to reliably analyze samples at
.24 nanograms?  Yes, said Doctor Buel.  And that was the end. 
They never produced a validation study.  They never described how they
validate it.  They never told you what the lower limit was.  They
never told you if the validation study was done and they never showed you the
paper. . . . These internal validation studies are
critical.


 


¶ 17.        
Indeed, everyone appears to have known of the existence of the studies,
which were referenced numerous times at trial.  Under these circumstances,
defendant cannot meet the first Brady prong—that the State suppressed
the validation studies.  See U.S. v. Pellulo, 399 F.3d 197, 211
(3rd Cir. 2005)  (identifying three factors in its analysis of whether
documents had been suppressed by prosecutor—“(1) respective knowledge of
parties; (2) [defendant’s] access to [evidence]; and (3) the government’s
representations”—and concluding that because defendant unequivocally had
knowledge of existence of disputed evidence, no suppression had occurred); United
States v. Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (concluding there is
no suppression where government discloses all information necessary for defense
to discover alleged Brady material on its own); and Elledge v. State,
911 So. 2d. 57, 64 (Fla. 2005) (rejecting defendant’s Brady violation
claim, finding, in part, that defendant failed to demonstrate that State
suppressed disputed evidence because disputed evidence was mentioned several
times during pre-trial depositions and trial).


¶ 18.        
The validation studies were well within the scope of what defense
counsel could be expected to investigate, and we note that Brady
“impose[s] no additional duty on the prosecution team members to ferret out any
potentially defense-favorable information from materials that are so
disclosed.”  Pellulo, 399 F.3d at 212.  Because we conclude
that defendant is unable to meet his burden under the first Brady prong,
we need not reach the two other prongs.


II.


¶ 19.        
Defendant also challenges his sentence as beyond the sentencing range
for first degree murder on the basis that the existence of two criminal
statutes with identical elements but different penalties violates equal
protection.  Defendant contends that this type of statutory scheme leaves
a prosecutor without a principled basis on which to choose between the two
identical element crimes.  Such a scheme, defendant argues, is inherently
arbitrary and violates the equal protection guarantees of the United States and
Vermont Constitutions because there is no legitimate purpose behind the
different penalty provisions attached to crimes with identical elements. 
Because we find no constitutional impediment to having the two statutes
coexist, we reject defendant’s arguments.[4]


¶ 20.        
We begin with the contested statutory scheme.  In Vermont, first
degree murder is defined as follows:


Murder committed by
means of poison, or by lying in wait, or by wilful, deliberate and premeditated
killing, or committed in perpetrating or attempting to perpetrate arson, sexual
assault, aggravated sexual assault, robbery or burglary, shall be murder in the
first degree.  All other kinds of murder shall be murder in the second
degree.


 


13 V.S.A. § 2301.  A
person convicted of first degree murder is subject to punishment of a minimum
of thirty-five years and a maximum term of life.  Id.
§ 2303(b).   In 1987, the Legislature passed an
aggravated-murder statute.  The statute lists eight applicable
circumstances giving rise to aggravated murder, one of which is a first or
second degree murder “committed in perpetrating or attempting to perpetrate
sexual assault or aggravated sexual assault.”  Id.
§ 2311(a)(8).  The punishment for aggravated murder is “imprisonment
for life and no lesser term.”  Id. § 2311(c).  Defendant
was charged, convicted, and sentenced under the latter aggravated-murder
statute, and sentenced to the greater penalty as a result.  


¶ 21.        
The portions of the two statutes that punish murder committed in
perpetrating or attempting to perpetrate sexual assault have exactly the same
elements.  In other words, the State is put to the same proof if it
charges first degree murder, sexual assault under § 2301 or aggravated
murder under § 2311(a)(8).  Both defendant and the State agree that
the statutes proscribe identical conduct, and that only the penalties differ.
 


¶ 22.        
Much of the parties’ briefs focus on whether the legislative history of
the later enacted aggravated-murder statute demonstrates that the Legislature
intended to grant prosecutors the discretion to choose which penalty for murder
should be applicable.  Defendant points to statements made during House
Judiciary Committee meetings, which he maintains indicate that at least some
members of the Committee mistakenly believed sexual assault first-degree murder
to be a lesser included offense of aggravated murder.  The State appears
to concede this misconception, but argues that the Legislature also intended to
afford the prosecution a choice of two penalties for murder committed during
the perpetration of sexual assault.  Thus, the legislative history
cited by each party—which seems to point in opposite and inconsistent directions—offers
no help in resolving the underlying question of whether, even if the
Legislature intended to allow the prosecutor to charge under either statute,
such a statutory scheme is constitutional.


¶ 23.        
Defendant offers the same constitutional challenge under both the
Federal and State Constitutions, contending that there is no rational basis for
enacting identical criminal statutes with different penalties.  The
seminal case with regard to treatment of identical or overlapping elements in
criminal statutes under the Federal Constitution is the United States Supreme
Court’s decision in United States v. Batchelder, 442 U.S. 114, 123-24
(1979).  Writing for a unanimous court in Batchelder, Justice
Marshall found no constitutional impediment to a statutory scheme that
permitted prosecutors to elect between offenses having identical elements but
different penalties.  Both of the statutes in that case prohibited
convicted felons from receiving firearms but each carried different
penalties.  The defendant argued that he was entitled to be sentenced
under the more lenient provision even though his conduct violated both
statutes.  The Supreme Court disagreed.  The Court first rejected the
claim that the provisions were void for vagueness, concluding that they
“unambiguously specify the activity proscribed and the penalties available upon
conviction.”  Id. at 123.  According to the Court, “[a]lthough
the statutes create[d] uncertainty as to which crime may be charged and
therefore what penalties may be imposed, they d[id] so to no greater extent
than would a single statute authorizing various alternative punishments.” 
Id.


¶ 24.        
Next, the Court addressed the defendant’s due process and equal
protection claims under the Fourteenth Amendment.  The Court noted that it
had “long recognized that when an act violates more than one criminal statute,
the Government may prosecute under either so long as it does not discriminate
against any class of defendants.”  Id. at 123-24.  The Court
held that providing prosecutors with such a choice does not empower the
executive branch to “predetermine ultimate criminal sanctions,” but “merely
enables the sentencing judge to impose a longer prison sentence than [the
lesser penalty statute] would permit.”  Id. at 124-25.  Thus,
the Court rejected the claim that the statutory scheme delegated to the
executive branch the Legislature’s responsibility to attach certain criminal
penalties to certain crimes.  The Court found instead that because the
provisions clearly set forth the range of penalties that prosecutors and judges
may seek and impose, “the power that Congress has delegated to those officials
is no broader than the authority they routinely exercise in enforcing criminal
laws.”  Id. at 126.


¶ 25.        
The Court further stated:


More importantly,
there is no appreciable difference between the discretion a prosecutor
exercises when deciding whether to charge under one of two statutes with
different elements and the discretion he exercises when choosing one of two
statutes with identical elements.  In the former situation, once he
determines that the proof will support conviction under either statute, his
decision is indistinguishable from the one he faces in the latter
context.  The prosecutor may be influenced by the penalties available upon
conviction, but this fact, standing alone, does not give rise to a violation of
the Equal Protection or Due Process Clause.  Just as a defendant has no
constitutional right to elect which of two applicable federal statutes shall be
the basis of his indictment and prosecution neither is he entitled to choose
the penalty scheme under which he will be sentenced.  


 


Id. at 125 (citations
omitted).


¶ 26.        
Because the circumstances in this case are indistinguishable from those
in Batchelder, the broad holding of Batchelder forecloses
defendant’s requested relief under the Fourteenth Amendment.  Our inquiry
does not necessarily end with Batchelder, given defendant’s claim that
the Vermont Constitution offers him a higher level of protection.[5]  We note, however, that most states
have embraced the reasoning in Batchhelder.  See Hart v. State,
702 P.2d 651, 662 (Alaska Ct. App. 1985) (noting that “majority” of courts have
followed Batchelder); Johnson v. State, 2003 WY 9, ¶ 33, 61 P.3d
1234 (following Batchelder along with “[m]any of our sister
jurisdictions”).  Those that depart from Batchhelder struggle,
unnecessarily from a constitutional standpoint, with two issues.  The
first one is whether the two statutes at issue have identical elements. 
See, e.g., People v. Marcy, 628 P.2d 69, 80-81 (Colo. 1981) (en banc)
(holding that culpable mental state required under statute prohibiting
first-degree murder by extreme indifference was not sufficiently distinguishable
from second-degree murder to warrant substantial difference in penalty
authorized by statutory scheme); State v. Williams, 2007 UT 98, ¶¶
16-18, 175 P.3d 1029 (noting “need to perform the close dissection of statutory
language” to determine whether elements of two statutes were sufficiently
similar to create constitutional violation).  The second issue is whether
the severity of the disparity between the penalties in the two statutes should
be a factor in deciding Batchelder’s applicability.  See Marcy,
628 P.2d at 74 n.5 (distinguishing Batchelder by noting “substantial
differences in both the minimum and maximum terms of confinement for the two
crimes” under consideration (quotation omitted)); cf. Hart, 702 P.2d at
662 (following Batchelder “at least to the extent that a defendant
challenges two felony statutes”); Johnson, 2003 WY 9, ¶ 31 (noting that
even those commentators questioning Batchelder’s logic suggest that
level of disparity between statutory penalties could be factor in determining
whether constitutional violation exists).


¶ 27.        
Apart from his inability to distinguish Batchhelder, defendant
offers little in the way of explaining why the Vermont Constitution compels a
different result from that held by the Court in Batchelder.  Defendant
does make a brief argument under the Common Benefits Clause—one amplified and
expanded by the dissent.[6] 
Indeed, the dissent concludes, entirely gratuitously, that the challenged
statutory scheme violates the Common Benefits Clause of the Vermont
Constitution by creating two classes of similarly situated individuals—those
charged with felony murder and those charged with aggravated murder—based on
unfettered and standardless prosecutorial discretion.  The underlying
premise of this Common Benefits analysis—that the statutory scheme at issue
unconstitutionally creates two classes of similarly situated individuals—is
faulty.


¶ 28.        
The Common Benefits Clause “is intended to ensure that the benefits and
protections conferred by the state are for the common benefit of the community
and not for the advantage of persons ‘who are a part only of that community.’
”  Baker v. State, 170 Vt. 194, 212, 744 A.2d 864, 878 (1999)
(quoting Vt. Const. ch. I, art. 7).  When we consider a constitutional
challenge under the Common Benefits Clause, we must first define the part of
the community disadvantaged by the law by examining “the statutory basis that
distinguishes those protected by the law from those excluded from the state’s
protection.”  Id. at 212-13, 744 A.2d at 878.  According to
the dissent, the statutory scheme challenged here creates two classes of
similarly situated persons—those charged with felony murder and subject to a
thirty-five-years-to-life sentence and those charged with aggravated murder and
subject to a mandatory life sentence.  But the statutes themselves do not
treat any particular individuals or classes of individuals differently. 
We are all equally subject to the same legislatively conferred prosecutorial
discretion to proceed under either statute as the circumstances may seem to
justify in a given case.  Defendants accused of murder during the course
of a sexual assault are nowhere deemed or recognized as a protected class, and
the risk that one prosecutor may pursue a mandatory life sentence while another
may file for a more discretionary sentence in the event of different homicides
arising from sexual assault is of no constitutional concern unless the choice
results from impermissible racial, ethnic or gender biases.  Batchelder,
442 U.S. at 125 n.9.


¶ 29.        
Just as a defendant has no constitutional right to elect the statute upon
which he will be prosecuted, “neither is he [constitutionally] entitled to
choose the penalty scheme under which he will be sentenced.”  Id.
at 125.  As the Supreme Court stated, “[t]he prosecutor may be influenced
by the penalties available upon conviction, but this fact, standing alone, does
not give rise to a violation of Equal Protection or Due Process.”  Id. 
The authority to charge aggravated murder in this case, rather than felony
murder, is of no more practical concern than the unfettered and broad
discretion exercised daily by Vermont prosecutors.  Certainly, on the
record of this case, which fails to reflect any discriminatory treatment, it is
of no constitutional concern either.  State’s attorneys may elect, solely
at their option, to file felony charges against defendants when the facts
equally support mere misdemeanors, and may freely choose to charge multiple
offenses, compatibly with the evidence, with potentially stacked sentences
instead of seeking a limited sentence based on a single charge.


¶ 30.        
Setting aside, for argument’s sake, the option of aggravated murder in
this case, the State’s remaining choices in charging defendant ranged from
simple assault to sexual assault to felony murder, with respective penalties
ranging from one year, 13 V.S.A. § 1023(b), to three years to life, 13 V.S.A. §
3252(f)(1), to thirty-five years to life, 13 V.S.A. §§ 2301, 2303(b). 
Virtually unlimited prosecutorial discretion in charging decisions is no
stranger to our law, and is entirely consistent with our Constitution. 
See Shippee, 2003 VT 106, ¶ 7 (“When there are overlapping criminal
offenses with which a defendant could be charged based on the facts, it is
within the prosecutor’s discretion to choose among them.”).  Against this
backdrop, we decline to hold that yet another unfettered charge option presents
an unconstitutional infringement of defendant’s fancied and suddenly emergent
right to fettered prosecutorial discretion.  We are not bothered by the
dissent’s point that the discretion to choose between criminal statutes with
differing elements “necessarily involves considerations of proof, strategy,
resources, and overall law enforcement objectives.”  Post, ¶
50.  Law enforcement policy, strategic leverage and resource allocation
issues do not evaporate for state’s attorneys choosing to pursue one statutory
penalty over another for a charged offense.


¶ 31.        
The dissent’s reasoning implies that all conduct chargeable under
statutes with identical elements but differing penalties is indistinguishable
to the extent that there can be no constitutionally supportable basis for the
State to seek prosecution under one statute rather than the other.  We
will not rely upon such a fiction to trump the Legislature’s unambiguous intent
to allow prosecutors to seek a mandatory life sentence for those who murder
during the course of a sexual assault.  Criminal misconduct often involves
individual circumstances that could legitimately support a prosecutor’s
decision to proceed under one statute rather than another, regardless of
whether the elements of the statutes are the same.  One murder in the
course of a sexual assault might be particularly heinous because of the nature
of the assault or the defendant’s state of mind, while another might be less so.


¶ 32.        
Ultimately, as the Supreme Court reasoned in Batchelder, a
prosecutor’s considerations in deciding which statute to proceed under will be
similar regardless of whether the statutes being considered have identical or
disparate elements.  This reasoning “recognizes the critical role of
prosecutorial discretion within our system of law in maintaining flexibility
and sensitivity.”  State v. Pickering, 462 A.2d 1151, 1160-61 (Me.
1983) (adopting Batchelder reasoning in rejecting constitutional challenge
to statutory scheme that allowed prosecutors to proceed against persons charged
with drunk driving under criminal or civil statutes with same elements but
varying penalties).


¶ 33.        
In the case of murder committed during a sexual assault, our Legislature
has determined to leave to the prosecutor the discretion to seek a mandatory
life sentence.  To the extent that the resulting law permits the
prosecutor to effectively circumscribe the trial court’s discretion in
determining the length of a defendant’s sentence, there is no constitutional
violation.  “[D]efendant has no due process right to have a judge
determine his or her sentence and, accordingly, a legislature may constrain or
eliminate altogether the role of judicial discretion in the sentencing
process.”  Ehrsam v. Rubenstein, 917 F.2d 764, 767 (3d Cir.
1990).  By the same token, “[i]t is also well settled that a legislature
can exercise its right to limit judicial discretion in sentencing by bestowing
on prosecutors the right to make decisions that may curtail judicial
discretion.”  Id.  Accordingly, the Vermont Legislature has
mandated certain outcomes for certain offenses upon conviction, rather than
leave the consequences to judicial discretion.  See, e.g., 13 V.S.A.
§ 3253a(b) (providing that person convicted of aggravated sexual assault
of child shall be imprisoned for not less than twenty-five years without
possibility of suspension, deferral, or supervised release).


¶ 34.        
As long as prosecutors exercise discretion in a manner that does not
arbitrarily discriminate against an individual or class of individuals based on
impermissible criteria such as race or religion, the State’s discretion is not
limited by any constitutional provision or principle.  Batchelder,
442 U.S. at 125 n.9; State v. Secrest, 331 N.W.2d 580, 583 (S.D. 1983)
(noting that Batchelder “recognized the long-standing rule that when an
action violates two criminal statutes, the government may prosecute under
either, providing that it does not discriminate against any class of
defendants”).  While we may argue in the abstract that prosecutorial
discretion is unfettered when choosing between statutes with identical
elements, this is, again, practically indistinguishable from prosecutorial
discretion in choosing between statutes with different elements.  In
either case, there is no constitutional basis to challenge prosecutorial
discretion in the absence of unlawful discrimination or some other actual and
articulable abuse of discretion.


Affirmed.


 



 
  

 

 
 
  

 

 
 
 FOR THE COURT:

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 Associate
 Justice

 

  


¶ 35.        
SKOGLUND, J., concurring.   I concur with the
majority’s constitutional analysis and its mandate, but I would avoid the
constitutional question and hold that the Legislature, in enacting the
aggravated murder statute, impliedly repealed that part of the felony murder
statute related to sexual assault.  See, e.g., State v. Bauder,
2007 VT 16, ¶ 27, 181 Vt. 392, 924 A.2d 38 (“It is, of course, a fundamental
tenet of judicial restraint that courts will not address constitutional claims
. . . when adequate lesser grounds are available.”); see also 4 W. LaFave, et
al., Criminal Procedure § 13.7(a), at 259 (3d ed. 2007) (concluding that courts
may avoid constitutional issue addressed in Batchelder “by utilizing
canons of statutory construction, such as that a later statute should prevail
over an earlier one with which it would otherwise overlap, or that the more
specific statute should prevail over the more general one with which it would
otherwise overlap”).


¶ 36.        
The felony murder statute has been on the books since 1869 and has
remained the same since at least 1947, except for a 1983 amendment that
substituted the words “sexual assault, aggravated sexual assault” for the word
“rape.”  1983, No. 28, § 1.  In 1987, the Legislature passed the
aggravated murder statute listing eight circumstances that give rise to
aggravated murder, including murder “committed in perpetrating or attempting to
perpetrate sexual assault or aggravated sexual, assault,” 13 V.S.A. §
2311(a)(8)—which is also one of circumstances for felony murder under the older
statute.  I agree with the trial court that the Legislature was plainly
aware of the felony murder statute and yet chose in 1987 to redefine murders
committed while perpetrating sexual assault as aggravated murders.  Such a
conclusion best implements the legislative intent, given the nature and timing
of the statutes in question.  Accordingly, I would hold that the
Legislature in 1987, with its enactment of the aggravated murder statute,
impliedly repealed the sexual assault component of the felony murder statute.


¶ 37.        
While we may not presume repeal by implication, we “will” conclude that
a statute has been impliedly repealed by another act if “(a) the acts are so
far repugnant that they cannot stand together, or (b) are not so repugnant, but
the later act covers the whole subject of the former and plainly shows it was
intended as a substitute therefor[e].”  State v. Baron, 2004 VT 20,
¶ 10, 176 Vt. 314, 848 A.2d 275 (citation omitted).  I agree with the Batchelder
Court that two statutes are not mutually repugnant merely because they produce
differing results when applied to the same factual situation, 442 U.S. at 122,
but I would conclude in this case that even though the statutes are not so far
repugnant, the later aggravated murder statute covers the whole subject of the
relevant part of the felony murder statute—murder perpetrated during a sexual assault
or aggravated sexual assault—and the timing and specificity of the later
statute makes the legislative intent manifest.  See, e.g., State v.
Chavez, 419 P.2d 456, 457-58 (N.M. 1966) (stating that it was “obvious”
when legislature amended narcotic drug law to include marijuana that it did so
with apparent intent to make it controlling over marijuana law providing for
lesser penalty); see also Cent. Vt. Hosp., Inc. v. Town of Berlin, 164
Vt. 456, 459, 672 A.2d 474, 476 (1995) (stating that when two statutes deal
with same subject matter, generally more specific and more recent provision
prevails).


¶ 38.        
The aggravated murder statute lists all circumstances under which first
or second degree murder will be considered aggravated, including during the
perpetration of a sexual assault or aggravated sexual assault. 
Accordingly, it supplants that circumstance—but only that circumstance—with
respect to the felony murder statute.  I realize that various persons
connected to the enactment of the aggravated murder statute in 1987—including
committee witnesses and at least one committee member—provided their particular
take on the implications of having the same elements in both statutes. 
But, as the majority and the dissent indicate, none of this legislative history
is definitive, and it certainly does not undermine the notion that the
Legislature, as a body, intended to impliedly repeal the overlapping part of
the felony murder statute.


¶ 39.        
For good reason, courts are generally “hesitant to resort to . . .
statements [of the purpose or nature of the proposed law] made by committee
members or other persons at the committee hearings.”  2A Singer &
Singer, Sutherland Statutory Construction § 48:10, at 583 (7th ed. 2007). 
Doing so would require one to consider what impact such statements may have
made on the majority of legislators, which could be considered indulging in
judicial legislation.  Id. § 48:2, at 548 (noting Justice Robert
Jackson’s stated preference for making decisions by statutory analysis rather
than “psychoanalysis of Congress” (quotation omitted)).  Under these
circumstances, the most reasonable and accurate course of action is to presume
implied repeal of the overlapping part of the two statutes.


 


__________________________________________


Associate
Justice


 


 


¶ 40.        
JOHNSON, J., dissenting.   To define crimes and fix
corresponding punishments is a quintessential legislative function.  To
define identical crimes and affix strikingly different punishments is a
perversion of that function.  No just and reasonable purpose could be
served by such a statutory scheme, nor, tellingly, does the majority here even
attempt to advance one.  “Prosecutorial discretion” to select from among
different offenses for reasons related to proof, resources, or remedial
objectives provides no answer to the simple question: What legitimate purpose
is served by defining two identical offenses with significantly different
punitive consequences?  The answer, in my view, is none.  Accordingly,
I respectfully dissent.  


¶ 41.        
Before addressing this issue, however, it is necessary to correct a
misleading suggestion in the majority opinion that defendant’s claims under the
Vermont Constitution were somehow inadequately preserved.  While
acknowledging that we must address defendant’s “claim that the Vermont
Constitution offers him a higher level of protection,” ante, ¶ 26, the
majority nevertheless states that defendant’s equal protection claim under the
Vermont Constitution was not “properly preserved,” ante, ¶ 27 n.7. 
The argument appears to have two components.  First, the majority notes
that defendant’s motion to dismiss did not expressly cite to Article 7 of
Chapter I of the Vermont Constitution, our equal-protection equivalent to the
Fourteenth Amendment of the United States Constitution.  This argument
exalts form over substance.  Defendant’s motion expressly asserted that
“[u]nder the Vermont Constitution, equal protection of the laws requires that
statutory classifications of crimes be based on differences that are real in
fact and reasonably related to the general purposes of criminal legislation and
that such protection is lacking if different statutes proscribe the same
criminal conduct with disparate criminal sanctions.”  No formal citation
to Article 7 was necessary to fully appreciate that defendant was raising an
equal protection claim under the Vermont Constitution.   


¶ 42.        
Nor is there any particular template for an adequate state
constitutional argument.  We have, to be sure, urged advocates to mine a
variety of sources when available, including historical materials, textual
analysis, “economic and sociological materials,” “sibling state” decisions
interpreting similar constitutional clauses, and any other arguments available
to the “imaginative lawyer.”  State v. Jewett, 146 Vt. 221, 227-28,
500 A.2d 223, 237 (1985).  None of these, however, is required. 
While mere mention of the Vermont Constitution may not suffice to preserve a
claim, there is no reason in theory why a claimant may not legitimately rely on
the language of the Vermont Constitution and reasoned argument for a
construction different from that of the federal courts construing the same or
similar language in the Federal Constitution.  I say “in theory” because
defendant’s trial motion here, while hardly exhaustive, certainly went well
beyond mere reasoned argument.  Defendant relied on a number of
sister-state decisions rejecting, on independent state grounds, the Supreme
Court’s holding in United States v. Batchelder, 442 U.S. 114
(1979), and a leading criminal law commentator who has criticized the high
court’s reasoning and argued that “[n]otwithstanding Batchelder, a state
might well conclude as a matter of state constitutional law that equal
protection of the laws” is violated where “different statutes proscribe the
same criminal conduct with disparate criminal sanctions.”  4 W. LaFave, et
al., Criminal Procedure § 13.7(a), at 259 (3d ed. 2007) (quotation
omitted).  There is simply no question, therefore, that defendant’s state
claims were adequately preserved.  


¶ 43.        
Turning to those claims, defendant asserts that the existence of two
criminal statutes with identical elements but different penalties violates due
process and equal protection because they serve no legitimate purpose and leave
a prosecutor with no principled basis on which to choose between the two
identical-element crimes.  The majority readily acknowledges that the
portions of the two statutes at issue which punish murder committed in
perpetrating or attempting to perpetrate sexual assault “have exactly the same
elements.  In other words, the State is put to the same proof if it
charges first degree murder, sexual assault under § 2301 or aggravated murder
under § 2311(a)(8).”  Ante, ¶ 21.  Indeed, the State here
has conceded that “the statutes proscribe identical conduct, and that only the
penalties differ.”  Id.


¶ 44.        
The majority nevertheless finds no constitutional infirmity in such a scheme
on the strength of the United States Supreme Court’s decision in Batchelder. 
There, the high court addressed a claim that the existence of identical
provisions in two statutes, each of which prohibited convicted felons from
receiving firearms but carried different penalties, violated a defendant’s due
process and equal protection rights.  The defendant argued that he was
entitled to be sentenced under the more lenient provision when his conduct
violated both statutes.  The Court rejected the argument, concluding that
there was essentially “no appreciable difference between the discretion a
prosecutor exercises when deciding whether to charge under one of two statutes
with different elements and the discretion he exercises when choosing one of
two statutes with identical elements.”  442 U.S. at 125.  Traditional
prosecutorial discretion, in other words, justified any disparate treatment of
offenders absent proof of selective or invidious prosecution.  


¶ 45.        
Albeit grudgingly, the majority here recognizes that while Batchelder’s
broad language forecloses defendant’s requested relief under the Fourteenth
Amendment, it does not preclude his claim under the Common Benefits Clause of
the Vermont Constitution, which is distinct from the Fourteenth Amendment’s
Equal Protection Clause and requires a more rigorous review than the highly
deferential rational-basis standard applied under an equal-protection analysis
not involving fundamental rights.  Baker v. State, 170 Vt. 194,
201-04, 744 A.2d 864, 870-71 (1999) (stating that Common Benefits Clause
“differs markedly from the federal Equal Protection Clause in its language,
historical origins, purpose, and development”).  Rather than adopt the
somewhat rigid tiered analysis employed by the federal rational-basis/strict
scrutiny tests, we clarified in Baker that Vermont courts have a duty
“to evaluate the object and effect of state laws” and to “engage in a
meaningful, case-specific analysis to ensure that any exclusion from the
general benefit and protection of the law would bear a just and reasonable
relation to the legislative goals.”  Id. at 204, 744 A.2d at
872.  Thus, the question here is whether the statutory classification
bears a just and reasonable relation to a legitimate governmental goal.


¶ 46.        
The statutory scheme at issue obviously creates two distinct classes of
similarly-situated individuals, those charged with sexual assault first-degree
murder under 13 V.S.A. § 2301 and those—like defendant—charged with
aggravated murder under § 2311(a)(8), and attaches significantly different
penalties to the two crimes.  The majority’s assertion that the
legislation creates no classification because all “are equally subject to the
same legislatively conferred prosecutorial discretion,” ante, ¶ 28, ignores
the plain fact that the statutes affix disparate punitive consequences to
identical conduct.  


¶ 47.        
Turning to the purported governmental purpose for the classification,
the State posits “prosecutorial discretion,” asserting that the Legislature
intended to grant prosecutors the discretion to choose different punishments by
charging under either § 2301 or § 2311(a)(8).  Indeed, the State
devotes much of its argument to listing the reasons why a prosecutor’s
discretion to charge under either murder statute is no different from the
discretion to pick and choose among any applicable criminal statute, so long as
the choice is not motivated by an illegal consideration, such as race or
gender.  The majority essentially adopts this position, finding that the
discretion “to charge aggravated murder in this case, rather than felony
murder, is of no more practical concern than the unfettered and broad
discretion exercised daily by Vermont prosecutors.”  Ante, ¶
29.  


¶ 48.        
The argument is entirely unpersuasive.  Prosecutorial discretion
may represent a legitimate governmental goal where the prosecutorial choice
involves statutes criminalizing similar but distinct behaviors, and the
charging decision turns on considerations of proof, strategy, resources, and
remedial objectives.  But the situation here involves two classes of
defendants who have committed identical element crimes and the prosecutorial
choice turns on little more than whim.  Indeed, to describe a prosecutor’s
charging decision in these circumstances as a “choice” is almost
meaningless—where there are no elements of proof or other standards involved,
there is simply nothing to inform the charging decision.  The result
offends the very core principles of our criminal justice system: fair notice to
the accused and evenhandedness in his or her treatment.  See Kolender
v. Lawson, 461 U.S. 352, 358 (1983) (“Where the legislature fails to
provide such minimal guidelines [to govern law enforcement], a criminal statute
may permit a standardless sweep that allows policemen, prosecutors, and juries
to pursue their personal predilections.” (quotation omitted)).


¶ 49.        
In focusing on whether prosecutorial discretion justifies any choice in
charging so long as it is not motivated by impermissible considerations such as
race or gender, the majority overlooks the inherent arbitrariness of the
statutory scheme itself.  A New York court addressing a statutory scheme
that treated juvenile misdemeanants differently depending on the forum in which
the charge happened to be brought explained the crucial distinction this way:


But, prosecutorial
discretion, broad and virtually unencumbered though it may be, cannot of itself
provide a rational basis for a statutory classification.  Prosecutorial
discretion can determine in which forum a charge is brought, or the gravity of
a charge, or whether a prosecution proceeds at all.  Prosecutorial
discretion cannot however determine the appropriate powers of a given court, or
its jurisdiction, or its sentencing options, if any.  The legislature does
that, within parameters laid down by the constitution.  For the
legislature constitutionally to mandate a certain sentence for a certain
act committed by a certain class of persons when the matter is before one
court, and to provide for something different when the matter is before another
court, there must be a rational basis for the distinction.


 


People v. Robert Z., 511
N.Y.S.2d 473, 479 (1986) (citations omitted).  The court ultimately
concluded that there was no rational basis for treating offenders differently,
concluding that “the guise of prosecutorial discretion” could not be used to
circumvent “the rational basis necessary for a statute’s constitutional
viability.”  Id.


¶ 50.        
The disconnect between the statutory classification and the governmental
goal becomes even clearer here when the legitimate interests underlying
prosecutorial discretion are examined.  Consider the common scenario of
overlapping (as opposed to identical) statutes with both different elements and
penalties.  There, a prosecutor’s choice between the statute requiring
proof of an additional element and the statute without that added element
necessarily involves considerations of proof, strategy, resources, and overall
law enforcement objectives.  We have quite properly refused to judicially
micromanage routine prosecutorial choices of this nature.  See State v.
Wesco, Inc., 2006 VT 93, ¶ 11, 180 Vt. 345, 911 A.2d 281 (“Because
prosecutors function as delegates of the executive, they retain broad
discretion to enforce the law including—so long as probable cause is
present—the decisions whether to prosecute in any given case and what charge to
file.”); State v. Calhoun, No. 92, 987, 2005 WL 3289391, *7 (Kan. Ct.
App. Dec. 2, 2005) (“When deciding to charge a crime under one of two statutes
containing different elements, the prosecutor has to examine the evidence and
determine under which statute the evidence falls.”).


¶ 51.        
Such practical considerations are notably absent, however, where the
“choice” involves identical-element statutes with different penalties.
 See LaFave, supra, Criminal Procedure § 13.7(a), at 256 (“Where
statutes are identical except for punishment, the prosecutor finds not the
slightest shred of guidance.” (quotation omitted)).  Indeed, as noted, in
such cases the traditional justifications for affording prosecutors broad
discretion literally have no application, and allowing prosecutors to “choose”
between identical-element crimes solely on the basis of punitive consequences
pushes prosecutorial discretion to the breaking point.  The two statutes
before us cannot pass constitutional muster for much the same reason that
unfettered prosecutorial choices have failed in other contexts: there is no
principled basis under the statutes to choose one over the other.  See,
e.g., In re Miller, 2009 VT 36, ¶ 23, 185 Vt. 550, 975 A.2d 1226
(“Although a degree of prosecutorial discretion is acceptable, we are skeptical
of statutes that appear to afford the prosecution a choice of two penalties of
such disparate nature.” (quotations and citations omitted)); In re G.T.,
170 Vt, 507, 514, 758 A.2d 301, 306 (2000) (noting that despite the importance
of prosecutorial discretion, “[i]t is one thing to give discretion in enforcing
a legislatively defined crime; it is quite another to give prosecutors the
power to define the crime”).  Indeed, even assuming that the State’s
charging decision is made in complete good faith, it is inherently and
unavoidably arbitrary where standards to govern the choice are
lacking.   


¶ 52.        
Instructively, a number of states have found equal protection violations
under their own constitutions where—as here—two identical criminal statutes
impose different penalties.  In State v. Campbell, 106 P.3d 1129
(Kan. 2005), for instance, the Kansas Supreme Court addressed an equal
protection claim challenging two criminal statutes prohibiting identical
conduct but with different penalties—one statute prohibited knowing possession
of ephedrine or pseudoephedrine with the intent to use the product to
manufacture a controlled substance while the other prohibited knowing
possession of drug paraphernalia with the intent to use it to manufacture a
controlled substance.  The court departed from Batchelder and held
that where two criminal statutes have identical elements but different
penalties, a defendant convicted of either crime can only be sentenced under
the lesser penalty.  Id. at 1139.  Importantly, the court’s
decision was grounded on its conclusion that there was no legitimate basis for
allowing a prosecutor the discretion to charge one crime over another based
solely on the penalty, noting that “the prosecutor should not be given the
discretion to effectively make a sentencing decision without the benefit of sentencing
information or expertise.”  Id. 


¶ 53.        
Similarly, in People v. Marcy, 628 P.2d 69, 74-75 (Colo. 1981)
(en banc), the Colorado Supreme Court also declined to follow Batchelder
under the Colorado Constitution and concluded that elements found in its
first-degree murder by extreme indifference and second-degree murder criminal
statutes were indistinguishable because each statute required an act performed
knowingly resulting in death.  Allowing duplicative criminal statutes to
impose different penalties for the same conduct, the court observed,
“irrationally discriminate[s] against an accused” and violates equal protection
guarantees.  Id. at 74.  The Hawai`i Supreme Court reached the
same conclusion under the Hawai`i Constitution in State v. Hoang,
holding that where “the same act committed under the same circumstances is, by
virtue of the prosecution’s charging option or whim, punishable either as a
felony or as a misdemeanor, under either of the two statutory provisions,
precisely because the elements of proof essential to either conviction are
exactly the same” equal protection is violated.  947 P.2d 360, 370 (Haw.
1997) (quotations omitted).


¶ 54.        
The overarching principle at stake in these decisions—as in the case
before us—is simply this: that we are a government of laws and not of
men.  This principle is elegantly expressed in the Vermont Constitution as
follows: “That all power being originally inherent in and consequently derived
from the people, therefore, all officers of government, whether legislative or
executive, are their trustees and servants; and at all times, in a legal way,
accountable to them.”  Vt. Const. ch. I, art. 6.  A legislative
scheme that permits the State to bring criminal charges against its citizens
arbitrarily and without adequate standards is a government not of laws, but of
men.  We countenance such a result at our peril.    


¶ 55.        
Therefore, I would hold that the statutory scheme at issue violates
defendant’s right to equal protection of the law under the Vermont
Constitution.  Of course, determining the appropriate remedy for a
constitutional violation of this nature presents a separate, though no less
important, issue.  Defendant’s assertion that the charge under
§ 2311(a)(8) should be dismissed and the case retried under § 2301 is
unpersuasive.  At trial, all sides agreed that the motion to dismiss could
be addressed at the end of the case because prosecution under either of the
applicable statutes involved the same elements, evidence, and issues of proof
and differed only as to sentence.  The jury’s ultimate conclusion that
defendant was guilty of aggravated murder under § 2311(a)(8) is equivalent
to a finding of guilt under § 2301, and that verdict should not be
disturbed on appeal.  


¶ 56.        
The more logical and appropriate remedy, rather, is to remand for a
resentencing of defendant under the lesser sentencing scheme.  Indeed,
this is the settled rule in at least one other jurisdiction that has rejected Batchelder
to hold that, where separate criminal statutes have identical elements but
different sentencing schemes, “the decision as to which penalty to seek cannot
be a matter of prosecutorial whimsy in charging.”  State v. Clements,
734 P.2d 1096, 1100 (Kan. 1987).  Thus, where statutes define “identical
offenses, a defendant can only be sentenced under the lesser penalty.”  Id. 
This rule has come to be known as the “identical offense sentencing doctrine,” State
v. Reyna, 234 P.3d 761, 780 (Kan. 2010); State v. Thompson, 200 P.3d
22, 33 (Kan. 2009), and provides simply that: “Where two criminal offenses have
identical elements but are classified differently for purposes of imposing a
penalty, a defendant convicted of either crime may be sentenced only under the
lesser penalty provision.”  State v. Nunn, 768 P.2d 268, 284 (Kan.
1989).


¶ 57.        
The doctrine is similar to the settled “rule of lenity,” although its
rationale differs somewhat.  The latter is predicated on the fundamental
right to adequate notice of what conduct may give rise to criminal punishment,
and the concomitant obligation to resolve any statutory ambiguity in favor of
the accused.  See State v. LaBounty, 2005 VT 124, ¶ 4, 179 Vt. 199,
892 A.2d 203 (“In interpreting a criminal statute, the rule of lenity requires
us to resolve any ambiguity in favor of the defendant.”); State v. Oliver,
151 Vt. 626, 629, 563 A.2d 1002, 1004 (1989) (“Penal statutes . . . are to be
strictly construed in a manner favorable to the accused.”).  


¶ 58.        
Here, the ambiguity was not in the wording of the statutes or the scope
of the conduct proscribed.  The flaw here went deeper, to the fundamental
fairness of the charging decision itself, and the inherent arbitrariness of a
statutory scheme unhinged from any objective charging criteria, and
circumscribed by nothing more than “prosecutorial whimsy.”  That is the
fundamental nature of the constitutional violation in this case, and the reason
why—as the Kansas Supreme Court has recognized—a defendant charged and
convicted under these circumstances may be sentenced only under the lesser
penalty provision. 


¶ 59.        
Accordingly, I would remand the case to the trial court for the purpose
of resentencing defendant under the first-degree murder statute.


¶ 60.        
I am authorized to state that Justice Dooley joins this dissent.


____________________________________



Associate
Justice














[1] 
For any DNA analysis, a sample is taken from virtually any cell type (e.g.,
blood, hair, skin, semen) in a process known as extraction.  The sample is
then subject to “short tandem repeats” testing in a process known as capillary
electrophoresis, in which a sophisticated DNA profiler kit is used to analyze
the DNA sequences at thirteen different loci along the DNA. The sequences found
at these thirteen loci is a person’s DNA profile.  The amount of sample
used for these processes is important because, as VFL scientists
testified, “[i]f you put too much in it will overwhelm the reaction and you
don’t get a nice pretty profile.  If you don’t put enough DNA in then
you’re simply not going to get a result and you may not get a complete
profile.”  Internal validation studies, which are lab specific
demonstrations of the proficiency of the DNA profiler kit, are especially
important because they include a recommended range of input DNA sample (i.e.,
the optimal quantity of DNA needed for accurate DNA testing).







[2] 
In another case, the United States Court of Appeals for the Seventh Circuit
offered the following justification for limiting what amounts to suppression
under Brady to evidence that could not have been discovered by a defendant
through the exercise of due diligence:


 


The Supreme Court
has described the Brady rule as applying to information known to the
prosecution but “unknown to the defense.” . . . [I]t would be a reasonable
application of this precedent to hold that the Brady rule does not apply
to information the defense can be expected to discover.  Refusing to
characterize as Brady material information the defense can be expected
to discover serves to weed out incredible claims of ignorance, to prevent
sandbagging, and is consistent with a focus on actual knowledge. 


 


Boss v. Pierce, 263
F.3d 734, 743 (7th Cir. 2001) (citations omitted); see also United States v.
Runyan, 290 F.3d 223, 245 (5th Cir. 2002) (where government afforded
defense full access to hard drive of seized computer, government, in not
identifying information helpful to defense contained in hard drive, did not
suppress that information, as Brady does not require “the Government,
rather than the defense, to turn on the computer and examine the images
contained therein”); United States v. Parks, 100 F.3d 1300, 1307 (7th
Cir. 1996) (Brady does not require “the Government to carry the burden
of transcribing” sixty-five hours of intercepted conversations because the
defendants “had been given the same opportunity as the government to discover
the identified documents” and “information the defendants seek is available to
them through the exercise of reasonable diligence” (internal quotations and
citation omitted)).


 







[3] 
Indeed, defendant’s attorney stated the following during his closing remarks:


 


The DNA testing is
not infallible, it is very fallible.  It is subject to human error, chain
of custody problems, contamination, lost evidence, and failure to have adequate
policies and procedures. . . .  In this particular case, as
in any case, there are requirements for a reliable DNA test.  It has to
have a reliable method that complies with established guidelines.  That
method has to be subject to developmental and environmental validation studies. 
This is critical. . . . [Defendant’s evidence] establishes
the manufacturer’s recommendations or guidelines or criteria for generating the
best results with the kit that they used in this case.  One nanogram to
2.5 nanograms.  Take that back into the jury room.


 







[4] 
The concurring opinion would avoid the constitutional issues surrounding the
choice of competing statutes in this case by applying the doctrine of implied
repeal.  While appreciating the appeal of this approach, we conclude that
the doctrine cannot be reconciled with the circumstances of this case. 
Repeal of legislation by implication is a disfavored judicial doctrine, and
will be found only where “(a) the acts are so far repugnant that they cannot
stand together, or (b) are not so repugnant, but the later act covers the whole
subject of the former and plainly shows that it was intended as a substitute
therefor[].”  State v. Baron, 2004 VT 20, ¶ 10, 176 Vt. 314,
848 A.2d 275 (citation omitted and emphasis added); see also Radzanower v.
Touche Ross & Co., 426 U.S. 148, 154 (1976) (observing that there are
two categories of repeal by implication: where provisions are in
“irreconcilable conflict,” and where “the later act covers the whole subject of
the earlier one and is clearly intended as a substitute . . . [b]ut in either
case, the intention of the legislature to repeal must be clear and manifest”
(emphasis added)).  See generally 1A Singer & Singer, Sutherland
Statutory Construction § 23:10, at 479 (7th ed. 2009) (“The party asserting the
implied repeal bears the burden to demonstrate beyond question that the
legislature intended in its later legislative action the unequivocal purpose to
effect a repeal.”).  There is nothing on the face of the aggravated-murder
statute or in the circumstances surrounding its enactment that evinces a clear
and manifest intent to replace the first-degree murder statute.







[5] 
The State cites State v. Shippee, 2003 VT 106, 176 Vt. 542, 839 A.2d 566, for the proposition
that we have adopted the equal protection analysis announced in Batchelder
for both overlapping and identical statutes.  In Shippee, we
addressed a defendant’s claim that he was subjected to arbitrary and
discriminatory enforcement because he was charged with a felony for lewd and
lascivious conduct under 13 V.S.A. § 2601 instead of a misdemeanor under 13
V.S.A. § 2632.  We rejected the defendant’s claim, holding that “[w]hen
there are overlapping criminal offenses with which a defendant could be charged
based on the facts, it is within the prosecutor’s discretion to choose among
them.”  Id. ¶ 7.  Though Shippee applied the Batchelder
constitutional jurisprudence to the facts of that case, our decision did not
include any extended discussion of the elements of the two crimes. 
Notably, the decision did not address whether the crimes were identical or the
effect of this distinction on the analysis.  In fact, Shippee does
not control our resolution of the present case because there is an additional
element in the lewd-and-lascivious conduct felony charge not present in the
misdemeanor charge.  See State v. Perry, 151 Vt. 637, 641, 563 A.2d
1007, 1010 (1989) (“It is within the prosecutor’s discretion to determine which
overlapping criminal offenses established by the facts should be charged, and
we will not interfere with the exercise of this discretion without a statement
by the legislature that such an infringement is intended.”).







[6] 
This issue was not, in any event, properly preserved.  Defendant presented
no argument under the Common Benefits Clause before the trial court. 
Rather, defendant merely declared, without reasoning or any attempt to
distinguish federal law, that the prosecutorial discretion afforded by the two
murder statutes violated the Vermont Constitution, Chapter 1, Articles 4 and
10.  See State v. Brillon, 2010 VT 25, ¶ 6, ___ Vt. ___, 995 A.2d
557 (declining to reach state constitutional issue where defendant cited
Vermont Constitution at trial but did not provide any substantive analysis of
how constitutional claim should differ under Vermont Constitution in comparison
to Federal Constitution).  On appeal, defendant relegates his Common
Benefits argument to a few pages at the end of his sixty-page brief.